UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

UNITED STATES OF AMERICA,          )
                                   )
            Plaintiff,             )
                                   )
       v.                          )    No. S1-4:11CR246 CDP
                                   )                  (FRB)
JERRY ELKINS,                      )
                                   )
            Defendant.             )

**MEMORANDUM,**
**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

All pretrial motions in the above cause were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b).  Defendant Jerry Elkins filed several pretrial motions. The motions were heard before the undersigned on January 25, 2012.  Following the hearing the undersigned ordered that a written transcript of the proceedings be prepared and filed with the court.  The transcript was filed on January 31, 2012 (Docket No. 536).  The undersigned has relied upon the written transcript as well as the electronic digital recording made of the proceedings in making the findings of fact set out herein.[1]

_____

    [1]Defendant Elkins also filed a Motion To Suppress Electronic Surveillance Evidence.  That motion is addressed in a separate Report and Recommendation.

1.    <u>Defendant Jerry Elkins' Motion To Suppress Physical Evidence</u> (Docket No. 356)

Testimony and evidence was adduced on the defendant's motion at a hearing before the undersigned on January 25, 2012. From the testimony and evidence adduced at the hearing the undersigned makes the following findings of fact and conclusions of law.

<u>Findings Of Fact</u>

In 2010 and 2011, Agents of the Bureau of Alcohol, Tobacco and Firearms (ATF), and officers of the Chicago Illinois Police Department assigned to ATF as Task Force Officers, as well as other law enforcement officers, were involved in an investigation of and organization known as the Wheels of Soul motorcycle gang (WOS). During the investigation law enforcement officers had learned that WOS members were engaged in narcotics trafficking and had made undercover drug purchases from WOS members. The investigation also revealed that the members of WOS often were armed. Officers had made undercover purchases of weapons from WOS members. Also during the investigation evidence was gathered through the use of a court authorized wiretap which was monitored by law enforcement officials in St. Louis, Missouri.

As a part of the above described investigation, in the evening hours of January 28, 2011 ATF Agent Christopher Labno, and ATF Task Force Officers Patrick Munyon and Jason Schoenecker were conducting surveillance in the vicinity of the WOS clubhouse in

- 2 -

Chicago, Illinois.  The officers were traveling together in an unmarked police car and were in civilian clothes.  While conducting surveillance these officers were in contact with other officers conducting surveillance and also with officers in St. Louis who were then monitoring conversations being overheard on the wiretap.

The wiretap monitoring officers reported that they overheard conversations in which the persons overheard, speaking in code were discussing the purchase and possession of cocaine.  It was related to these officers by the monitoring officers in St. Louis that based on overheard conversations between WOS members Allan Hunter and Jerry Elkins, also known as Shakka, they believed that there was cocaine present in a vehicle then being driven by Elkins.  Although not set out in detail at the hearing the substance of those conversations and the meaning attributed to them by the listening officers is set out in detail in the government's response to the defendant's motion.  The vehicle was described as a Cadillac bearing Colorado license plates.

At about this time Officers Labno, Munyon and Schoenecker observed a Cadillac Escalade automobile bearing Colorado license plates parked across the street from the WOS clubhouse in Chicago. The officers later saw the vehicle as it drove on 16th Street. They followed the car as it pulled into a gas station.  They continued to observe the Cadillac as it left the gas station and drove on Cicero Avenue.  Eventually the Cadillac pulled onto a

- 3 -

hotel parking lot.   When it did so the driver of the Cadillac failed to signal for a turn, a traffic law violation.  The Cadillac pulled into a parking space on the hotel lot.   The officers followed the Cadillac onto the hotel parking lot, pulled their police car behind the Cadillac, and activated the flashing lights in the grill area of the police vehicle.

The officers then stepped out of their vehicle and approached the driver of the Cadillac who had also stepped out of his vehicle.  Officer Munyon asked the driver to produce a driver's license and proof of insurance for the Cadillac.  He produced an Arkansas driver's license in the name of Jerry Elkins.  In response to questioning by Officer Munyon, Elkins said that he lived in Aurora, Colorado, that he worked in Indiana and that he was passing through Chicago.

Elkins asked why the officers had pulled up behind him. They told him that they were investigating a series of gas station robberies and burglaries in the area and that his car matched the description of a vehicle involved in those incidents.  This was not true.  This story was a ruse concocted by the officers in order that the real reason for their actions, and the extent of the ongoing WOS investigation not be revealed and compromised.  During the encounter Elkins told the officers that he was a former police officer and explained that he was dismissed as a result of an incident in which he was accused of assaulting another person.

- 4 -

Agent Labno then asked Elkins if he had any weapons on his person and Elkins replied that he did not.  Agent Labno asked if he could conduct a pat down search of Elkins' person and Elkins agreed.  Elkins then put his hands on the Cadillac and assumed a "search position".  As he did so Elkins removed his wallet from his pants pocket and threw it onto the front seat of the Cadillac.  Agent Labno conducted a pat down search of Elkins and found no weapons.  Agent Labno then asked if there were any weapons or contraband in the Cadillac.  Elkins said no.  Elkins was asked if the officers could search the car and he said yes.

Agent Labno and Officer Munyon then searched the car.  While those officers searched the car Officer Schoenecker stood with Elkins at the rear of the Cadillac.  There was a large dog in the rear seat area of the Cadillac.  In the console area of the car Agent Labno found and seized a loaded .40 caliber pistol, a holster, and a gun magazine.  On the front seat he found Elkins' wallet and $260.00 in currency.  The officers also found a jacket and vest with WOS marking, WOS patches, and notes.  Elkins was then taken into custody, handcuffed and placed in the back seat of the police car.  Officer Munyon advised Elkins of the <u>Miranda</u> rights.

Agent Labno and Officer Schoenecker got into the front seat of the police car.  Officer Munyon stood outside by the Cadillac.  Agent Labno told Elkins that he was in trouble and Elkins replied that he knew that he was.  Elkins was asked if he wanted to cooperate and provide information to law enforcement.

- 5 -

Elkins replied that he had no information to give.  Elkins told the officers that he did not want to go to jail and that if they let him go they could just keep the gun and money that they had found. The officers told Elkins that they would agree to this arrangement. They then released him from custody and departed the area keeping the gun and cash which were later booked in as evidence.

Throughout the encounter with the officers Elkins was calm and cooperative.

Jerry Elkins testified at the hearing as did Agent Labno and Officer Munyon.  Elkins' testimony agreed in some respects with the testimony of the officers but disagreed in others. Specifically, Elkins testified that he did not consent to a pat down search of his person, and did not consent to a search of his car.  To the extent that it is necessary to resolve these discrepancies in testimony in order to determine the issues raised in the defendant's motion, having had the opportunity to hear the testimony of all of the witnesses, to observe their demeanor while testifying and to consider all matters which reflect upon their credibility, the undersigned does choose to credit the testimony of the officers on these matters.

<u>Discussion</u>

As grounds to suppress the evidence seized from him on January 28, 2011, defendant Elkins appears to assert that there was no lawful basis for the actions of the officers on that evening and that he did not consent to a search of his vehicle.

- 6 -

The Fourth Amendment of the United States Constitution sets out the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Constitution, Amend. IV.  The Eighth Circuit Court of Appeals has described that,

> Supreme Court jurisprudence has placed police-citizen encounters into three tiers or categories:  First, there are communications between officers and citizens that are consensual and involve no coercion or restraint of liberty.  Such encounters are outside the scope of the Fourth Amendment.  Second, there are the so-called *Terry*-type stops.  These are brief, minimally intrusive seizures but which are considered significant enough to invoke Fourth Amendment safeguards and thus must be supported by a reasonable suspicion of criminal activity.  Third, there are highly intrusive, full-scale arrests, which must be based on probable cause.

United States v. Poitier, 818 F.2d 679, 682 (8th Cir. 1987) cert. denied, 484 U.S. 1006 (1988).  The court noted that in analyzing police/citizen encounters a court must ". . . determine whether [defendant] was seized and if so, at what point; and if [defendant] was seized, was there objective justification sufficient to create reasonable suspicion that [defendant] was engaging in criminal activity."  Id. at 681.

As the above discussion recognizes not every encounter between a police officer and a citizen constitutes an unreasonable seizure under the Fourth Amendment:  "Obviously, not all personal

- 7 -

intercourse between policemen and citizens involves 'seizures' of persons.  Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968); see also United States v. Mendenhall, 446 U.S. 544, 553-54 (1980)("Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards.  The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but 'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.'")(quoting United States v. Martinez-Fuerte, 428 U.S. 543, 554 (1976).  "[M]ere police questioning does not constitute a seizure." Florida v. Bostick, 501 U.S. 429, 434 (1991).  "[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions." Id. (quoting Florida v. Royer, 460 U.S. 491, 497 (1983)(plurality opinion)).

In order to determine whether or when an encounter between a police officer and a citizen constitutes a Fourth Amendment detention or seizure, "the crucial test is whether, taking into account all of the circumstances surrounding the

- 8 -

encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" Id. at 437 (quoting Michigan v. Chesternut, 486 U.S. 567, 569 (1988)); see also Mendenhall, 446 U.S. at 554 (holding "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave"). A police officer's subjective belief as to whether or not he has detained an individual plays no part in the Fourth Amendment analysis. The court must "examine the facts and circumstances at the time from [the defendant]'s perspective as a reasonable person being questioned." United States v. Garcia, 197 F.3d 1223, 1226 (8th Cir. 1999).

As noted in the above findings of fact the officers saw that upon turning into the hotel parking lot Elkins failed to signal before turning, a traffic violation, and at some point characterized their encounter with Elkins as a "traffic stop." In his motion the defendant first claims that none of the officers involved in the stop had the authority to stop a vehicle for traffic violations and that the purported traffic stop was a mere pretext, and that the real reason for the officers' actions was that the officers believed that cocaine could be found in the Cadillac driven by Elkins. The defendant's assertion that none of the officers had authority to conduct a traffic stop or to enforce

- 9 -

traffic laws is not supported by the evidence adduced at the hearing.  The evidence showed that two of the officers involved in the encounter with the defendant, Officers Munyon and Schoenecker, were employed as officers of the Chicago, Illinois, Police Department and authorized to enforce traffic laws.  As to the defendant's claim that the traffic stop was a mere pretext and not the real reason for the stop, in <u>Whren v. United States</u>, 517 U.S. 806 (1996) the Supreme Court held that observation of a traffic violation gives probable cause to an officer to stop the vehicle. <u>Id.</u> at 810.  This is so even if the officer has other motives in making the stop.  <u>Id.</u> at 812-13.  <u>See also United States v. Williams</u>, 429 F.3d 767, 771 (8th Cir. 2005).

It should be noted that Elkins' vehicle was not "stopped" as such.  Rather, Elkins had already pulled into a parking place and parked his vehicle.  The officers then pulled their unmarked police car behind Elkins' car and turned on the flashing lights in the grill area of the police car.  The act of parking the police vehicle behind Elkins' car and turning on the flashing lights did not constitute a seizure within the meaning of the Fourth Amendment.  <u>United States v. Dockter</u>, 58 F.3d 1284, 1287 (8th Cir. 1995).

Elkins and the officers emerged from their respective vehicles simultaneously.  Officer Munyon then asked to see Elkins' driver's license and proof of insurance.  Elkins provided his driver's license to the officer.  The request for identification,

- 10 -

and Elkins' act of producing the license did not constitute a Fourth Amendment seizure.  <u>Florida v. Bostick</u>, 501 U.S. at 435; <u>United States v. Slater</u>, 411 F.3d 1003, 1006 (8th Cir. 2005).

The government contends in its response to the defendant's motion that the officer's initial encounter with Elkins was a consensual encounter at least until the point where the officers conducted the pat down search of Elkins' person.  The government asserts that at the point of the pat down search the encounter became an investigatory detention.  As noted above, the parking of the police car behind Elkins' car with grill lights flashing, and the subsequent request for identification did not render the encounter a seizure within the meaning of the Fourth Amendment.  Further, during the encounter Elkins was calm and cooperative with the officers.  He brought up with them the fact that he was a former police officer, discussed his current work status and told them why he was in Chicago.  While talking with Elkins the officers did not display any weapons or restrain him in anyway.  Under all of these circumstances a reasonable person would not have believed that he was not free to leave.

Even if the encounter became such that at some point a reasonable person would not have felt free to leave, the entire encounter was nevertheless lawful because the officers had a reasonable articulable suspicion that Elkins was engaged in criminal activity, namely, that he was in possession of cocaine.

The officers had a reasonable articulable suspicion upon which to stop and question Elkins.

Law enforcement officers may detain an individual for a brief period of time if they have reasonable suspicion that criminal activity is afoot. Terry v. Ohio, 392 U.S. 1, 30 (1968). Adams v. Williams, 407 U.S. 143, 145-46 (1972). In order to detain a person in such circumstances an officer must have a "particularized and objective basis" for suspecting criminal activity. United States v. Jacobsen, 391 F.3d 904, 906 (8th Cir. 2004). "Whether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances." United States v. Maltais, 403 F.3d 550, 554 (8th Cir. 2005), cert. denied, 546 U.S. 1177 (2006). "While 'reasonable suspicion' must be more than an inchoate 'hunch,' the Fourth Amendment only requires that police articulate some minimal objective justification for an investigatory [detention]." United States v. Fuse, 391 F.3d 924, 929 (8th Cir. 2004). The process by which police officers may arrive at such a conclusion was described by the Supreme Court in United States v. Cortez, 449 U.S. 411, 418 (1981):

> The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible. First, the assessment must be based upon all of the circumstances. The analysis proceeds with various

objective observations, information from
police reports, if such are available,
and consideration of the modes or
patterns of operation of certain kinds of
lawbreakers. From these data, a trained
officer draws inferences and makes
deductions – inferences and deductions
that might well elude an untrained
person.

The process does not deal with hard
certainties, but with probabilities.
Long before the law of probabilities was
articulated as such, practical people
formulated certain common-sense
conclusions about human behavior; jurors
as factfinders are permitted to do the
same – and so are law enforcement
officers. Finally, the evidence thus
collected must be seen and weighed not in
terms of library analysis by scholars,
but as understood by those versed in the
field of law enforcement.

The second element contained in the idea
that an assessment of the whole picture
must yield a particularized suspicion is
the concept that the process just
described must raise a suspicion that the
particular individual being stopped is
engaged in wrongdoing.

The observations of, and information available to, the officers may

concern matters that are in and of themselves wholly lawful, <u>Terry</u>

<u>v. Ohio</u>, 392 U.S. at 27-28, but when considered together justify

some further investigation. <u>Id.</u> at 22. <u>United States v. Barker</u>,

437 F.3d 787, 790 (8th Cir. 2006). During an investigative stop

police officer may take such steps as are reasonably necessary to

protect their personal safety and to maintain the status quo.

<u>United States v. Hensley</u>, 469 U.S. 221, 235 (1985). The police

officer may conduct a pat down search of the suspect if the officer

- 13 -

has a reasonable, articulable suspicion that the suspect may be armed. Terry, 392 U.S. at 30; United States v. Banks, 553 F.3d 1101, 1105 (8th Cir. 2009).[2]

Here, the officers' reasonable suspicion was founded on conversations between Allan Hunter, Elkins and others, overheard by the wiretap monitoring agents in St. Louis. The substance of those telephone conversations and the meaning attributed to them are set out in detail in the government's response to the defendant's motion. Based on the overheard conversations the St. Louis agents related that they suspected that Elkins had cocaine in his vehicle. "When a team of law enforcement officers is involved in an investigation, the issue is whether all the information known to the team provided 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant' the investigative stop." United States v. Winters, 491 F.3d 918, 921 (8th Cir. 2007), citing United States v. Robinson, 119 F.3d 663, 666-67 (8th Cir. 1997). Based on the information provided to them by the St. Louis agents, as well as their own observations on the night in question, and the information known to

---

[2]The officers had ample cause to reasonably believe that Elkins might be armed on account of their knowledge of the violent acts committed by WOS members with weapons, on account of the propensity of WOS members to be armed, and upon their belief that Elkins could be involved with drugs, and therefore to conduct a pat down search of his person. However, nothing was found or seized from Elkins' person during the pat down search and therefore nothing subject to this suppression motion relates to the pat down search.

- 14 -

them in their ongoing investigation the officers had reasonable suspicion to stop and detain Elkins and to conduct an investigation to confirm or dispel their suspicions.  The officers asked Elkins for permission to search his vehicle, a request which was reasonably related to their reason for the stop, namely the suspicion that Elkins was carrying cocaine in his car.  United States v. Sharpe, 470 U.S. 675, 682 (1985).

Elkins consented to a search of his vehicle.  Persons may give up their Fourth Amendment rights by consenting to a search. Schneckloth v. Bustamonte, 412 U.S. 218 (1973).  Such consent must be given freely and voluntarily.  Id.  In determining whether consent to search was given freely and voluntary, the court must examine the totality of the circumstances under which it is given. United States v. Mendenhall, 446 U.S. 544 (1980).  In United States v. Chaidez, 906 F.2d 377 (8th Cir. 1990) the Eighth Circuit Court of Appeals set out factors to be considered in determining whether consent to search was voluntarily given.  Characteristics of persons giving consent which may be relevant to the question include: (1) their age; (2) their general intelligence and education; (3) whether they were intoxicated or under the influence of drugs when consenting; (4) whether they consented after being informed of their right to withhold consent or of their Miranda rights; and (5) whether, because they had been previously arrested, they were aware of the protections afforded to suspected criminals by the legal system.  Id. at 381.  Characteristics of the

- 15 -

environment in which consent was given include: whether the person who consented (1) was detained and questioned for a long or short time; (2) was threatened, physically intimidated, or punished by the police; (3) relied upon promises or misrepresentations made by the police; (4) was in custody or under arrest when the consent was given; (5) was in a public or a secluded place; or (6) either objected to the search or stood by silently while the search occurred. Id. The factors should not be applied mechanically, id. No single factor is dispositive or controlling. United States v. Bradley, supra, at 366 (Citing United States v. Ponce, 8F.3d 989, 997 (5th Cir. 1993)).

Applying these factors in this case leads the undersigned to conclude that the consent to search given by the defendant was voluntary. At his arraignment before the court on August 1, 2011, Elkins told the court that he was 48 years of age, had graduated from high school and was able to read and write. There is also evidence before the court that Elkins had served as a police officer in the past. There is no evidence that Elkins was under the influence of drugs or otherwise intoxicated at the time when consent was given. Consent to the search was given immediately after Agent Labno requested consent. The defendant was in an open and public area when consent was given. There is no evidence that the defendant was threatened or coerced by the officers to induce his consent to search or that any promises or misrepresentations were made to him by the officer to obtain his consent to search.

- 16 -

Therefore, the search of defendant's vehicle and the seizure of items therefrom was lawful.

Conclusion

For all of the above reasons the defendant's Motion To Suppress Evidence should be denied.

2. <u>Defendant Jerry Elkins' Motion to Dismiss Count XIV Of The Indictment For Lack Of Proper Venue</u> (Docket No. 358)[3]

Neither party presented any evidence on defendant's motion at the hearing on January 25, 2012. Rather, the parties agreed that the motions could be submitted on the pleadings and memoranda submitted to the court. Therefore, for purposes of this motion, certain factual averments set out in the parties' motions and memoranda are accepted as true.

As grounds for his motion the defendant asserts that no mention is made in Count (XIII) of the indictment or in any of the other portions of the indictment adopted in Count (XIII) of any act having occurred in the Eastern District of Missouri. In response the government notes that Count (XIII) alleges a conspiracy to commit murder in aid of racketeering activity in violation of 18 U.S.C. § 1959(a)(5), and further notes that venue has been held

---

[3]Defendant's Motion is addressed to Count XIV of the original indictment filed in this cause on June 9, 2011 (Docket No. 1). A superseding indictment was filed on June 21, 2012 (Docket No. 745). Count XIV in the original indictment is replead as Count XIII in the superseding indictment. Count XIII of the superseding indictment charges the same offense, and in the exact same language as plead in Count XIV of the original indictment. Defendant's motion is herein considered as addressed to Count XIII of the superseding indictment.

proper in conspiracy cases "in any jurisdiction in which an overt act in furtherance of the conspiracy was committed by any of the conspirators." United States v. Granados, 117 F.3d 1089, 1091 (8th Cir. 1997), quoting United States v. Bascope-Zurita, 68 F.3d 1057, 1062 (8th Cir. 1995), cert. denied, 516 U.S. 1062 (1996).

No overt acts in furtherance of the conspiracy alleged in Count (XIII) are set out in the indictment, however, the statute does not require that overt acts be set out in the indictment. See United States v. Orena, 32 F.3d 704, 714 (2nd Cir. 1994). In its response to defendant's motion the government avers that evidence exists to show that overt acts committed in furtherance of the conspiracy alleged in Count (XIII) were in fact committed in the Eastern District of Missouri. Those acts are set out in the government's response and include telephone calls made to and from persons located in the Eastern District of Missouri which relate to the conspiracy alleged in Count (XIII). The government asserts that telephone calls made to and from the Eastern District of Missouri by persons who are members of and acting in furtherance of the conspiracy are sufficient to establish venue in this district. See United States v. Stewart, 878 F.2d 256, 258 (8th Cir. 1989); United States v. Rommy, 506 F.3d 108, 119 (2d Cir. 2007), cert. denied, 552 U.S. 1260 (2008).

Furthermore, 18 U.S.C. § 3237(a) provides that,

Except as otherwise expressly provided by Enactment of Congress, any offense against the United States begun in one district and

- 18 -

> completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued or completed.

Conspiracy is such a "continuing" offense and venue is proper in a district in which an overt act in furtherance of the conspiracy was committed.  See United States v. Rommy, 506 F.3d at 119.

Venue is a question to be determined by the jury, and if at issue, the court may submit the issue to the jury.  See United States v. Shyres, 898 F.2d 647, 657-58 (8th Cir. 1990).  See Eighth Circuit Model Jury Instructions § 3.13.

<u>Conclusion</u>

For the reasons stated above the defendant's Motion To Dismiss Count (XIII) For Lack Of Proper Venue should be denied.

3.    <u>Defendant Jerry Elkins' Motion to Dismiss Count XIV Of The Indictment For Multiplicity</u> (Docket No. 360)[4]

In his motion the defendant claims that Count (XIII) of the indictment should be dismissed because it is multiplicitous. An indictment is multiplicitous if it charges the same crime in separate counts.  A multiplicitous indictment is impermissible because the jury can convict the defendant on the multiple counts, subjecting the defendant to multiple punishments for the same crime in violation of the Double Jeopardy Clause of the Fifth Amendment. United States v. Sandstrom, 594 F.3d 634, 651-52 (8th Cir. 2010); United States v. Platter, 514 F.3d 782, 785 (8th Cir. 2008).  If

---

[4]See Fn3.

each offense requires proof of an element not required by the others, however, the crimes are not considered the same and a double jeopardy challenge fails. Blockburger v. United States, 284 U.S. 299, 304 (1932); Sandstrom, 594 F.3d at 654. "[T]he Blockburger test focuses on the statutory elements of the offense, rather than the evidence presented at trial." Sandstrom, 594 F.3d at 654 (internal quotation marks and citation omitted). In addition, the specific charges brought against the defendant in the indictment must also be examined. Id. To show a violation of double jeopardy, the defendant must show that the offenses charged are in law and fact the same offense. United States v. Roy, 408 F.3d 484, 491 (8th Cir. 2005).

The defendant claims that the offenses charged in Count 1 (RICO Conspiracy) and Count (XIII) allege the same offense "because proof of the RICO Conspiracy, in fact, rests upon proof of the attempt to commit the murder offense" alleged in Count (XIII). In support of his position the defendant relies on the district court opinion in United States v. Gardner, 417 F.Supp. 703 (D.MD. 2006). The court in Gardner found that separate charges of RICO Conspiracy under 18 U.S.C. § 1962(d) and (so called) VICAR conspiracy under 18 U.S.C. § 1959(a) passed the Blockburger test because each charge required proof of an element that the other did not. Nevertheless, the Gardner court went on to examine the facts underlying each charge and found them to be the same, and held that

- 20 -

Congress did not intend that separate punishments be imposed for violation of the separate statutes.

In <u>United States v. Basciano</u>, 599 F.3d 184 (2nd Cir. 2010) the Second Circuit Court of Appeals held that a RICO Conspiracy charge under 18 U.S.C. § 1962(d) and a VICAR murder conspiracy charge under 18 U.S.C. § 1959(a) were separate and distinct offenses, applying the <u>Blockberger</u> test and specifically rejected the "fact-based" analysis applied in <u>Gardner</u>. <u>Id.</u> at 198-99. The Court held that the double jeopardy clause was not violated by the separate prosecution under each statute.

Other courts have also held that Congress authorized multiple punishments for violations of 18 U.S.C. § 1962(d) and 1959(a), contrary to the holding in <u>Gardner</u>. <u>See</u> <u>United States v. Ayala</u>, 601 F.3d 256, 265-66 (4th Cir. 2010); <u>United States v. Mahdi</u>, 598 F.3d 883, 888-89 (D.C. Cir. 2010). The defendant acknowledges this authority in his memorandum but asks the court to follow instead the holding in <u>Gardner</u>. The undersigned finds the holdings in <u>Basciano</u>, <u>Avala</u> and <u>Madi</u>, and the reasoning thereof to be more persuasive and rejects the defendant's invitation to follow and adopt the holding in <u>Gardner</u>.

<u>Conclusion</u>

For the above reasons the defendant's Motion To Dismiss Count (XIII) Of The Indictment For Multiplicity Should be denied.

Accordingly,

**IT IS HEREBY RECOMMENDED** that defendant Jerry Elkins' Motion To Suppress Physical Evidence (Docket No. 356) be denied.

**IT IS FURTHER RECOMMENDED** that Defendant Jerry Elkins' Motion to Dismiss Count (XIII) Of The Indictment For Lack Of Proper Venue (Docket No. 358) be denied.

**IT IS FURTHER RECOMMENDED** that Defendant Jerry Elkins' Motion to Dismiss Count (XIII) Of The Indictment For Multiplicity (Docket No. 360) be denied.

The parties are advised that any written objections to these findings and determinations shall be filed not later than **October 5, 2012.** Failure to timely file objections may result in waiver of the right to appeal questions of fact. Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).


*Frederick R. Buckles*
UNITED STATES MAGISTRATE JUDGE

Dated this 25th day of September, 2012.

- 22 -